70785. MACON-BIBB COUNTY HOSPITAL AUTHORITY
v. ROSS.
(335 SE2d 633)

DEEN, Presiding Judge.

The appellee, Annie Mae Ross, commenced this action against the appellant, the Medical Center of Central Georgia, seeking recovery for alleged negligence in its administration of a drug during her hospitalization. The jury returned a verdict of $27,000 for the appellee, and this appeal followed.

While at work on April 8, 1981, the appellee became ill, and her employer took her to the emergency room of the appellant. She arrived at the emergency room at approximately 2:40 p.m., at which time she was having difficulty breathing and had a bluish discoloration of her skin due to lack of oxygen in the blood. The appellee had a slow pulse rate and her blood pressure was 250/150, which required immediate medical attention.

At 2:52 p.m., the appellee became unresponsive, and at 2:55 p.m. she went into respiratory arrest. (A respiratory therapist had to insert an endotracheal tube into the appellee's trachea.) At 2:58 p.m., Nipride, a drug extremely effective at decreasing blood pressure, was administered intravenously, and her blood pressure quickly dropped. (By 3:12 p.m. her blood pressure was 120/90, and the physician ordered discontinuation of the Nipride, although it appears that the drug actually was administered until 3:31 p.m.) In fact, by 3:28 p.m., the appellee had no blood pressure at all. Because of the rapid drop in pressure, the attending physician ordered intravenous administration of Dopamine, a drug potent at elevating blood pressure, and at 3:20 p.m. it was started in the appellee's right wrist. After the Dopamine was started, the appellee's blood pressure stabilized, and she was transferred to the cardiac care unit at 4:30 p.m.

At midnight a nurse noted the IV in the appellee's arm and a "bruise bluish in color." The next notation in the patient chart was entered at 11:00 a.m. the following morning, at which time the appellee's right arm was swollen, sore, and with a large blistered area around the IV. An identical entry was subsequently recorded at 4:00 p.m. There is no indication in the records that a physician was consulted or informed of this condition until 6:50 p.m., when the blistered right arm was shown to a Dr. Wilcox. Later that evening, another physician cleansed the blistered area and treated it for the burn; a large area of the appellee's lower right arm was permanently scarred. It is undisputed that the injury to the appellee's arm was caused by an infiltration of the Dopamine, i.e., the drug seeped out of the vein into the surrounding tissue. While an infiltration may result from improper technique, it may also be due to the size of the IV needle, the fragility of the patient's veins, or a particular patient's physical intolerance of an IV.

At trial, the appellee's expert witness, Nancy Murphy (a registered nurse), testified that according to the Physician's Desk Reference (PDR), a reference book described by the witness as the Bible for anyone involved in administering medications, Dopamine should be infused into a large vein whenever possible in order to prevent the possibility of extravasation into adjacent tissue. The PDR specifically recommended the large vein at the bend of a patient's elbow; less suitable infusion sites should be used only if the patient requires immediate attention, and if resort is made to such a less suitable site, the IV should be moved to a larger vein as soon as possible. A Dopamine IV should be monitored continuously for free flow. Should an infiltration of Dopamine occur, the PDR suggested treatment of the damaged area as soon as possible, preferably within 12 hours, with a saline solution containing Regitine. A physician's order was required before Regitine could be administered.

Nurse Murphy testified further that from her review of the hospital records, she felt that the hospital personnel had been negligent in inserting the IV in the smaller vein at the appellee's wrist, or at least in the failure to document why it was not placed in the recommended site initially or subsequently. She also suggested that the hospital should have utilized an IV infusion pump, rather than a drip chamber, which would have better regulated the amount of the flow. Perhaps most importantly, Murphy critized the failure to notify promptly a physician of the appellee's swollen and blistered arm. *Held*:

1. The appellant contends that the trial court erred in allowing Murphy to testify that an IV infusion pump should have been used rather than a drip chamber, on the basis that she was not qualified as an expert on the standard of care applicable to the defendant hospital because she was not familiar with the standard of care in similar hospitals in similar communities. Whether a witness is qualified to give an opinion as an expert is within the trial court's discretion, which will not be disturbed on appeal unless manifestly abused. *Smith v. Hosp. Auth. of Terrell County*, 161 Ga. App. 657, 659 (288 SE2d 715) (1982).

In the instant case, nurse Murphy testified that she was familiar with several hospitals in the Atlanta, Georgia area and in Forsyth County, Georgia, but she had never worked at a hospital in the vicinity of Macon, Georgia. (The appellant's own nurse expert was familiar with hospitals in Augusta, Georgia, but similarly had never worked in any hospital in the Macon area.) Neither party adduced a comparison of the size and available resources of the defendant hospital with those of the hospitals with which nurse Murphy was familiar. The testimony that the defendant hospital emergency room treated 61,000 people per year in 1981 suggests, nevertheless, that the defendant hospital did not fall within the category of a small county hospital.

Application of the "locality rule," however, is misplaced where the question actually concerns the professional judgment of the hospital staff, rather than the adequacy of the facilities of a small hospital. See *Wade v. John D. Archbold Mem. Hosp.*, 252 Ga. 118 (311 SE2d 836) (1984). With regard to the IV infusion pump, the appellee's witness criticized the hospital staff's decision not to utilize one, and the appellant defended its use of a drip chamber as more prudent, considering all of the circumstances; no issue was raised about the availability of the infusion pump. Accordingly, under *Wade v. John D. Archbold Mem. Hosp.*, supra, there was no abuse of discretion in allowing nurse Murphy to testify about the propriety of using an IV infusion pump.

2. It is uncontroverted that the infiltration of Dopamine caused the skin on the appellee's arm to slough off, which ultimately resulted

in the scarring. The appellant here contends that it was entitled to a directed verdict because the appellee failed to show (1) that the hospital personnel had caused the infiltration, and (2) that prompt notification of the treating physicians could have alleviated the effect of the infiltration. We reject those contentions.

Both parties acknowledged the authority of the PDR concerning the proper administration of Dopamine. There was no dispute that the preferred infusion site was a large vein at the bend of the elbow, rather than the smaller veins around the hand and wrist, specifically for the purpose of reducing the risk of infiltration. The appellant emphasized at the trial that the PDR allows for less suitable infusion sites in an emergency situation, such as the appellee's condition when the Dopamine IV was started. The PDR, however, also instructs that the IV should be switched to a more suitable site as soon as possible, and that the infusion site should be continuously monitored. In short, from the evidence the jury was authorized to find (1) that there was a risk of infiltration notwithstanding observance of certain safeguards, and (2) that the defendant hospital failed to take such recommended measures, and thereby unreasonably increased the appellee's risk of suffering an infiltration.

There was no real disagreement with the appellee's evidence that the primary treatment for a Dopamine infiltration is with Regitine. A physician (not one of the attending physicians during the appellee's hospitalization) testifying for the appellant, claimed that that antidote to Dopamine would have been unavailing if applied more than 2 - 3 hours after the infiltration; he also opined that administration of Regitine would have been inappropriate in the appellee's case, because it might have countered the positive effect of Dopamine by lowering her blood pressure. The physician's testimony created a factual issue over whether the appellee's actual injury was causally related to not having been treated with Regitine, but, contrary to the appellant's contentions, it did not mandate a finding that the injury to the appellee's arm was only the imaginary or possible result of negligence and thus too remote to be a basis for recovery. OCGA § 51-12-8, generally; compare, *Parrott v. Chatham County Hosp. Auth.*, 145 Ga. App. 113 (243 SE2d 269) (1978). The trial court properly denied the appellant's motion for directed verdict.

3. The appellant also contends that the trial court erred in failing to charge the jury generally on the appellee's burden of adducing expert medical testimony in support of her medical negligence action. Specifically, the appellant asserts that the trial court erred in refusing to charge (1) that the proper method of diagnosing a case is a medical question for an expert witness, and (2) that expert testimony based upon a possibility is too remote to support a verdict; also enumerated as error was the trial court's charge that the expert opinion testimony

was not conclusive on the jury and that the jury could assign it what weight it deemed appropriate. We find no error in the charge as given.

Generally, in a malpractice case the absence of expert evidence on behalf of the plaintiff precludes submission of the case to the jury, but the trial court determines whether that evidentiary threshold is crossed. *Pilgrim v. Landham*, 63 Ga. App. 451, 454 (11 SE2d 420) (1940). There simply is no reason to advise the jury of the plaintiff's burden. When a case does reach the jury, the jury is not bound to accept the expert testimony, however, and the trial court certainly did not err in so instructing the jury. *Smith v. Godfrey*, 155 Ga. App. 113 (270 SE2d 322) (1980).

The trial court also did not err in refusing to give either of the 2 requested jury charges, because neither was adjusted to the facts in the instant case. *Barlow v. Veber*, 169 Ga. App. 65, 67 (311 SE2d 501) (1983). No issue of misdiagnosis was involved, and, as indicated above, the appellee's evidence did not consist of mere possibilities, conjecture, or speculation.

4. The appellee has moved for imposition of 10 percent damages pursuant to OCGA § 5-6-6. However, "[w]hile defendant's appeal is not meritorious, we cannot agree that it was so palpably without merit as to admit of no other conclusion than that it was filed for purposes of delay." *Great Atlantic & Pacific Tea Co. v. Burgess*, 157 Ga. App. 632, 633 (278 SE2d 174) (1981). Accordingly, the motion for 10 percent damages is denied.

*Judgment affirmed. Pope and Beasley, JJ., concur.*

DECIDED SEPTEMBER 10, 1985 —
REHEARING DENIED SEPTEMBER 26, 1985 — 

*Joseph W. Popper, Jr., John A. Draughon*, for appellant.
*Neal D. McKenney, Jane M. Jordan*, for appellee.